# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| |  |
|---|---|
| **PYRAMID LAKE PAIUTE TRIBE,** <br><br> Plaintiff, <br><br> v. <br><br> **SYLVIA BURWELL, Secretary, Health and Human Services <u>et al.</u>,** <br><br> Defendants. | Case No. 1:13-cv-01771 (CRC) |

## <u>MEMORANDUM OPINION</u>

The Indian Self Determination and Education Assistance Act enables Indian tribes to assume responsibility for programs and services that federal agencies would otherwise provide to Indians. The Pyramid Lake Paiute Tribe submitted a contract proposal to the Secretary of Health and Human Services under the Act for funding to operate an emergency medical services ("EMS") program that the Indian Health Service ("IHS"), a component of Health and Human Services, had been funding directly since 1993. After receiving the Tribe's proposal, the Secretary discontinued the EMS program, which IHS viewed as financially untenable, and denied the Tribe's request on the ground that the agency would not have funded the program going forward. The Tribe brought suit and has moved for summary judgment, arguing that the Secretary lacked authority to deny the proposal. The Court agrees. Once the Secretary receives a valid proposal to assume the operation an ongoing program, the Act requires her to accept the proposal unless one or more enumerated declination criteria are met. Because she did not rest her decision on any of those criteria, denying the Tribe's proposal violated the Act. The Court will therefore grant summary judgment in favor of the Tribe and direct the Secretary to negotiate with the Tribe to determine the appropriate funding level for the contract.

I.   **Background**

   A. Statutory Background

Congress passed the Indian Self-Determination and Education Assistance Act ("ISDEAA") to promote Indian tribes' rights to self-governance by enabling them to assume responsibility for certain federal programs. See 25 U.S.C. § 450a. To further that purpose, ISDEAA directs the Secretary of Health and Human Services and the Secretary of the Interior to "enter into a self-determination contract or contracts with a tribal organization to plan, conduct, and administer programs" that were created to benefit Indian tribes. 25 U.S.C. § 450f(a)(1). Upon authorization by a tribe, a "tribal organization" may submit a proposal for a self-determination contract to the relevant Secretary. Id. § 450f(a)(2). The Secretary must approve the proposal within 90 days unless she provides "written notification to the applicant that contains a specific finding that clearly demonstrates that or that is supported by a controlling legal authority" showing that one or more of five declination criteria exist. Id. One of the declination criteria is that "the amount of funds proposed under the contract is in excess of the applicable funding level for the contract[.]" Id. § 450f(a)(2)(D). The "applicable funding level for the contract," in turn, shall not be less than the amount the Secretary "would have otherwise provided for the operation of the programs or portions thereof for the period covered by the contract[.]" Id. § 450j-1(a)(1). Additional funding is available "for the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management[,]" as well as the start-up costs of the program during its initial year. Id. §§ 450j-1(a)(2), (5). But "the provision of funds . . . is subject to the availability of appropriations and the Secretary is not required to reduce funding for programs . . . serving a tribe to make funds available to another tribe or tribal organization[.]" Id. § 450j-1(b). District courts have original jurisdiction over claims

2

arising under the ISDEAA and "may order appropriate relief including money damages, injunctive relief . . . , or mandamus" for violations of the Act. Id. § 450m-1(a).

B. Factual Background

The Fort McDermitt Paiute and Shoshone Tribes ("Fort McDermitt Tribe") reside on the Fort McDermitt Indian Reservation, a small, remote community on the border between Nevada and Oregon. Pl.'s Statement of Material Facts in Support of Mot. for Sum. J. ("Pl.'s SOF") ¶ 3; Compl. ¶ 23. IHS has operated a health clinic at Fort McDermitt for Indians living in the area since the 1970s. Def.'s Statement of Material Facts in Support of Mot. for Sum. J. ("Def.'s SOF") ¶ 1; Pl.'s Mot. for Summ. J. ("Pl.'s Mot.") Ex. B ("Declination Letter") at 1. The Fort McDermitt clinic provides primary medical, dental, and mental health care to its patients, as well as alcohol and drug treatment programs. Def.'s SOF ¶ 2.

IHS had also operated an EMS program for the Fort McDermitt area since 1993. Declination Letter at 1. The cost of operating the EMS program increased unexpectedly beginning in 2010 as a result of an IRS determination that IHS must classify personnel working for the program under individual service contracts as employees, rather than independent contractors. Def.'s SOF ¶¶ 22–23. On March 21, 2013, the Fort McDermitt clinic held a governing board meeting and presentation for representatives of the Fort McDermitt Tribe. Id. ¶ 15. The presentation and accompanying budget analysis explained that the FY 2012 total operating costs for the EMS program were $502,611, while its revenues were only $102,711. Id. ¶ 18. The agency explained that it had been making up the difference with revenues from the clinic and IHS discretionary funds. Id. ¶¶ 20–21; Declination Letter at 1.

The Pyramid Lake Paiute Tribe ("Tribe" or "Pyramid Lake Tribe") is a federally-recognized Indian tribe that provides a range of health care services in other areas of Nevada under an ISDEAA contract with IHS. Pl.'s SOF. ¶¶ 1–2. On January 13, 2013, the Fort McDermitt Tribe, by

3

resolution of its governing body, designated the Pyramid Lake Tribe as its "tribal organization" under the ISDEAA to contract for an EMS program within the Fort McDermitt area. Id. ¶ 6. The Tribe submitted a contract proposal to IHS on June 21, 2013, which IHS received on July 8, 2013, seeking to incorporate the Fort McDermitt EMS program into the Pyramid Lake Tribe's existing health delivery services. Id. ¶¶ 8–13. The proposal requested $502,611 for operating costs—which was the actual cost to IHS of operating the program in FY 2012— plus $196,739 for start-up costs and $136,139 for indirect contract support costs. Id. ¶ 12.

As required by Nevada law, the Fort McDermitt EMS program regularly contracted with an area hospital, Humboldt General Hospital, to act as the EMS program's "base" hospital. Def.'s SOF ¶ 30. In November 2012, however, Humboldt General established its own EMS station site in the Fort McDermitt area. Id. ¶ 9. As a result, on August 15, 2013, the hospital notified IHS that it would no longer serve as the base hospital for the Fort McDermitt EMS program. Id. ¶ 30. IHS suspended operations of the EMS program four days later. Id.

On September 30, 2013, IHS sent a letter to the Tribe notifying it that IHS had declined its ISDEAA proposal. Declination Letter at 1. The agency explained that IHS had "ceased operation of the Fort McDermitt EMS program" due to its large operating deficit. Id. at 3. Because IHS had discontinued the program, it reasoned that the base amount available for contracting under section 450j-1(a)(1) was zero. It therefore declined the Tribe's proposal under section 450f(a)(2)(D) as being "in excess of the applicable funding amount." Declination Letter at 4. As an alternative ground, IHS indicated that it had declined the proposal "to the extent that the Tribe funding request include[d] the third-party revenues generated by the Fort McDermitt Clinic used . . . to fund the EMS program." Id. IHS asserted that these third-party revenues were not generated by the EMS program, were speculative, and were "not in themselves a program, function, service or activity" under section 450f(a)(1). Id.

4

The Tribe brought suit under the ISDEAA against IHS and the Secretary of Health and Human Services, now Sylvia Burwell, seeking to require IHS to enter into a self-determination contract with the Tribe to operate the Fort McDermitt EMS program. Both sides have moved for summary judgment. The Secretary has also moved to dismiss for failure to join indispensable parties—namely, other area tribes whose funding may be affected by the outcome of the case—under Federal Rule of Civil Procedure 12(b)(7). The Court held a hearing on the parties' motions on August 28, 2014.

**II.     Standard of Review**

A. Motion to Dismiss for Failure to Join Indispensable Parties

Federal Rule of Civil Procedure 12(b)(7) permits dismissal of a complaint for failure to join a party under Rule 19, but courts are generally "'reluctant to grant motions to dismiss of this type.'" 16th & K Hotel, LP v. Commonwealth Land Title Ins. Co., 276 F.R.D. 8, 12 (D.D.C. 2011) (quoting 5C Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1359 (3d ed. 2004)). For such a motion, the court accepts as true the allegations in the complaint, but also considers extrinsic evidence. Id. (citing Davis Cos. v. Emerald Casino, Inc., 268 F.3d 477, 479 n.2, 480 n.4 (7th Cir. 2001)). The defendant has the burden to demonstrate "'the nature of the interest possessed by an absent party and that the protection of that interest will be impaired by the absence.'" Citadel Inv. Grp., L.L.C. v. Citadel Capital Co., 699 F. Supp. 2d 303, 317 (D.D.C. 2010) (quoting Citizen Band Potawatomi Indian Tribe of Okla. v. Collier, 17 F.3d 1292, 1293 (10th Cir. 1994)).

B. Summary Judgment

On a motion for summary judgment, the court must determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

250 (1986). Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The court must draw all reasonable inferences in favor of the moving party, but the nonmovant must produce material facts showing that there is a genuine dispute. Anderson, 477 U.S. at 247–48.

**III. Analysis**

    A. Dismissal Under Rule 19

The Court first will address the Secretary's Rule 19 motion. Dismissal of a complaint for failure to join an indispensable party under Federal Rule of Civil Procedure19 is "warranted only when the defect is serious and cannot be cured." Direct Supply, Inc. v. Specialty Hospitals of Am., LLC, 878 F. Supp. 2d 13, 23 (D.D.C. 2012) (citations omitted). The first step in determining whether a case must be dismissed for failure to join an indispensable party is to determine whether there are any absent parties that are necessary to the action. A party is indispensable under Rule 19(a)(1) if:

> (A) in that person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

The Secretary argues that because the Tribe's proposal implicates the budget for other tribes served by IHS in the region, each of these tribes is a necessary party to this action. Def.'s Mem. in Supp. of Mot. to Dismiss or, alternatively, Summ. J. ("Def.'s Mot") at 14–19. She reasons further that because the other tribes are protected by sovereign immunity, they cannot be joined and the case therefore must be dismissed. Id.[1]

---

[1] The Secretary argued initially that the Fort McDermitt Tribe was a required party because it had

6

A party is "interested" under Rule 19 if it has a legally protected interest in property or rights to be adjudicated by the case. See, e.g., Ramah, 87 F.3d at 1351 ("Rule 19 analysis must begin with an assessment of whether the nonparty Tribes have a legally protected interest"); Three Affiliated Tribes of Fort Berthold Indian Reservation v. United States, 637 F. Supp. 2d 25, 30 (D.D.C. 2009) ("the Court must consider whether that party has a legally protected interest in the subject of the action"). But the "interest" that the Secretary attributes to the other local tribes is simply a practical concern on the part of the tribes over what happens to funds they might receive, not a legal claim to those funds. As the Secretary argues throughout her briefing, IHS has discretion to allocate its funding as it sees fit. See Lincoln v. Vigil, 508 U.S. 182, 193 (1993). That discretion, however, is inconsistent with the contention that the tribes have a legal claim to the funds IHS distributes from its general appropriation. See id. at 193 (holding that courts have no authority to oversee the allocation of funds from IHS's lump sum appropriation).

Citizen Potawatomi Nation v. Norton, 248 F.3d 993 (10th Cir. 2001), on which the Secretary relies, is not to the contrary. There, five tribes entered into a joint self-governance contract which required the Secretary to fund their respective programs according to an agreed upon formula. Id. at 995–96. After one tribe sued the Secretary to receive additional funds, the court determined that the other four tribes were indispensable parties due to their interest in the funds under the contract. Id. at 997–98. Because the other tribes in this case do not have a contractually-protected right to the relevant funds, Citizen Potawatomi Nation does not apply.

Even assuming the other tribes are interested parties, they are not "indispensable" because the Secretary can adequately represent their interests in this case. In Ramah, the D.C. Circuit found

---

not specifically authorized the Pyramid Lake Tribe to pursue this litigation. Def.'s Mot. at 21–22. The Secretary conceded that argument, however, after the Fort McDermitt Tribe submitted a tribal resolution specifically authorizing the Pyramid Lake Tribe to pursue this case. Def.'s Reply at 4. The Secretary now argues only that other tribes that receive funding from the local IHS service unit are interested. Id.

7

that IHS could adequately represent the interests of other tribes where one tribe sued to recover funds under a self-determination contract. The Court reasoned that the Secretary and the other tribes shared a general interest in the equitable allocation of federal funds. 87 F.3d at 1351. There may be circumstances in which the Secretary's interests do not align with other tribes. But here the Secretary's position is that the Pyramid Lake Tribe's proposal would unfairly benefit the Fort McDermitt tribe by enabling it to receive more than its share of funding, to the detriment of neighboring tribes. The other tribes in the region presumably have that precise interest.

      B.   <u>Standard of Review Under the ISDEAA</u>

Under the ISDEAA, the Secretary has "the burden of proof to establish by clearly demonstrating the validity of the grounds for declining [a] contract proposal." 25 U.S.C. § 450f(e)(1). The parties disagree, however, about how much deference courts are required to give to the Secretary's interpretation of the statute in seeking to satisfy its burden. The Secretary argues that her reading of the Act is entitled to the same level of deference that is given to agency decisions under the Administrative Procedures Act ("APA"), while the Tribe argues that the Court should not extend any deference to the agency.

The Indian law canon of statutory construction requires that laws affecting Indians "be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." <u>Cobell v. Norton</u>, 240 F.3d 1081, 1101 (D.C. Cir. 2001). When the canon applies, the Court should "give the agency's interpretation 'careful consideration' but '. . . not defer to it.'" <u>Id.</u> (quoting <u>Muscogee (Creek) Nation v. Hodel</u>, 851 F.2d 1439, 1445 n.8 (D.C. Cir. 1988)). Without explicitly addressing the issue, the D.C. Circuit in at least one case has reviewed the ISDEAA without according deference to IHS's interpretation. <u>See</u> <u>Ramah Navajo Sch. Bd. v. Babbitt</u> ("<u>Ramah</u>"), 87 F.3d 1338, 1344 (D.C. Cir. 1996), <u>amended</u> (Aug. 6, 1996). And one fellow district court explicitly adopted a *de novo* standard of review after the Secretary conceded that IHS's interpretation was

owed no deference. Seneca Nation of Indians v. Dep't of Health and Human Services., 945 F. Supp. 2d 135, 141–42 & n.5 (D.D.C. 2013). This appears to be the majority view. See id. (collecting cases). But see Citizen Potawatomi Nation v. Salazar, 624 F. Supp. 2d 103, 109 (D.D.C. 2009) (applying APA standard to claims under *both* the APA and the ISDEAA and where parties apparently had not raised the Indian canon).

The ISDEAA is designed to "circumscribe as tightly as possible the discretion of the Secretary[.]" Ramah, 87 F.3d at 1344. As mentioned above, the Secretary must prove her declination decision was lawful, 25 U.S.C. § 450f(e)(1), and the ISDEAA prohibits the Secretary from promulgating regulations under the ISDEAA except in specific circumstances, id. § 450k(a); cf. United States v. Mead Corp., 533 U.S. 218, 226–27 (2001) (whether to accord Chevron deference turns on whether "Congress delegated authority to the agency generally to make rules" under the relevant statute). The ISDEAA also incorporates the Indian law canon of construction in its model ISDEAA contract language. 25 U.S.C. § 450l(c). While not determinative, these statutory provisions demonstrate why according deference to IHS's interpretation of the ISDEAA would be incongruous with the structure and purpose of the ISDEAA. For these reasons and because the Indian law canon applies to the ISDEAA, the Court will review the statute *de novo*.

### C. Declination Of the Tribe's ISDEAA Proposal

As noted previously, the ISDEAA requires the Secretary to accept a tribe's contract proposal unless a specifically enumerated declination criterion exists. 25 U.S.C. § 450f(a). The Secretary's written notice to the tribe must explain the reasons for a declination; she may not rely on post-hoc justifications. See id. § 450f(a)(2) (Secretary must accept a proposal absent written notice specifically demonstrating that an enumerated declination criteria exists). IHS offered two reasons in its written notice for declining the Tribe's proposal. First, it stated that, because IHS had canceled the EMS program after the Tribe filed its proposal, the funding level for the program was

9

now zero and, as a result, the funding sought in the Tribe's proposal was "in excess of the applicable funding level for the contract." Declination Letter at 5. As an alternative justification, IHS declined the proposal "to the extent that the Tribe funding request includes the third-party revenues generated by the Fort McDermitt Clinic[.]" Id. In its motion for summary judgment, the Secretary advances two additional reasons for the declination: (1) the proposed contract is in excess of the amount IHS allocated to the Fort McDermitt Tribe in its budget, which IHS refers to as its "tribal share"; and (2) the Tribe has not demonstrated that it can obtain an agreement from a "base" hospital, which IHS contends is a requirement of Nevada law. Def.'s Mot. at 38–41. The Court addresses each of the Secretary's arguments below.

### i. *Closure Prior to Declination*

Section 450f(a)(2)(D) of the ISDEAA permits the Secretary to decline a contract proposal if the proposed funding exceeds the applicable funding level for the program. Section 540j-1(a)(1), in turn, establishes the applicable funding level at not less than the amount the Secretary "otherwise would have provided" for the program. In its declination letter, IHS explained that because it had shut down the Fort McDermitt EMS service, the amount the Secretary would have provided for the program was zero and, as a result, the Tribe's proposed funding exceeded that amount. IHS relied on two cases to support this reasoning. In the first, Lincoln v. Vigil, the Supreme Court held that IHS has unreviewable discretion over how to spend funds from its discretionary appropriation, including whether to discontinue ongoing programs. 508 U.S. at 193–94. IHS argues that Lincoln permitted it to cancel the EMS program. The second, Los Coyotes Band of Cahuilla & Cupeno Indians v. Jewell ("Los Coyotes"), 729 F.3d 1025 (9th Cir. 2013), established that an agency may decline an ISDEAA contract proposal to create a program that it had not operated previously. Id. at 1033–34. In Los Coyotes, the Bureau of Indian Affairs declined a tribe's request to create a law enforcement program within its reservation. The tribe responded by submitting an ISDEAA

proposal to create the program itself. The Bureau denied the proposal under section 450f(a)(2)(D), reasoning that because it had never operated the program, the amount it "otherwise would have spent" was zero.

Neither <u>Lincoln</u> nor <u>Los Coyotes</u> supports the Secretary's decision. <u>Lincoln</u> did not involve an ISDEAA proposal at all. It simply said that the Secretary has the discretion to discontinue an existing program, a point the Tribe does not appear to contest. The Secretary's ability to use discretionary funds as she sees fit does not relieve her obligation to adhere to the standards of Act in assessing a tribe's proposal. And in <u>Los Coyotes</u>, the agency was not operating the program when the tribe submitted its ISDEAA proposal. Here, by contrast, IHS *was* operating the EMS program, and had made no decision to discontinue it, when the Tribe submitted its proposal. The cases relied on by the Secretary therefore present different questions than the one at issue here. The question before the Court is at what point must the agency calculate the applicable funding under section 450f(a)(2)(D): at the date of the proposal or at the date of the declination letter? Neither party has directly briefed this question, and it appears to be an issue of first impression.

Given the structure and purpose of the ISDEAA, the Court concludes that the applicable funding level for a contract proposal is to be determined from the date the agency receives the tribe's proposal. Accepting the Secretary's alternative interpretation would undo the carefully-constructed declination criteria in the ISDEAA. The agency could simply circumvent these limited criteria whenever it wished by canceling a program after receiving a self-governance proposal and then declining the proposal, as IHS did here. This would be a more difficult case had IHS decided to cancel the EMS program prior to its receipt of the Tribe's proposal. But at the hearing, government counsel acknowledged that IHS had made no plans to reduce the funding level for the EMS program until after receiving the proposal. Accordingly, the agency was not permitted to decline the proposal under section 450f(a)(2)(D) based on a subsequent cancellation of the program.

11

### ii. Third-Party Funding

As alternative grounds, the declination letter also argued that the amounts IHS had been transferring from the clinic to the EMS program to make up the shortfall in operating revenues were not within the base funding under 450f(a)(2)(D) because those funds were not themselves a "program, function, service, or activity available for contracting." Declination Letter at 5. But there is nothing in the ISDEAA that requires the *funding* for self-determination programs to themselves be a "program, function, service, or activity available for contracting." As discussed above, the applicable funding level for a contract proposal under sections 450f(a)(2)(D) and 450j-1(a)(1) is determined based on what the Secretary otherwise would have spent, not on the source of the funds the Secretary uses. If the Secretary chooses to augment its spending on a program with other funds available to her, nothing in the Act permits her to deduct those amounts from the tribe's funding under an otherwise acceptable ISDEAA contract. Accordingly, the Secretary improperly declined the proposal on that basis.

### iii. "Tribal Share" Allotment

The Secretary argues in her motion for summary judgment that IHS calculates funding for programs based on the "'tribal share' that supports the programs that are to be transferred to the Tribe." Def.'s Mot. at 15. A "tribal share" IHS explains, is IHS's budgetary allocation for a given tribe, which is then subdivided between geographic regions and specific programs. Wiggins Decl. ¶¶ 6–10. The Secretary further contends that the funding level in the Tribe's proposal was in excess of the tribal share IHS determined the Fort McDermitt tribe was entitled to receive. According to the Secretary, the 2013 local service unit budget for the Fort McDermitt and other area tribes was $3.5 million, $554,080 of which "was available for contracting by the Fort McDermitt Tribe." Id. at 17. Of that amount, IHS assigned $38,746 for the EMS program and made up the difference using revenues from other sources. Id. at 26. Thus, the Secretary argues, even if the EMS program

remained in existence, the Tribe's proposal was in excess of the $38,746 that IHS had allocated for the program in its budget.

As a threshold matter, this argument cannot support the Secretary's motion for summary judgment because she did not make it in the declination letter. The ISDEAA only permits the Secretary to decline a contract proposal if she provides written notice setting forth valid grounds for declination. 25 U.S.C. § 450f(a)(2). IHS never advanced this tribal share argument in declining the Tribe's proposal. It cannot now be used as a post-hoc to justification for the agency's decision.

The Secretary's argument fails in any event. As discussed above, the Secretary may decline an ISEAA proposal under section 450f(a)(2)(D) if the requested funding exceeds the amount IHS "would have otherwise provided for the operation of the program." The Secretary's tribal share argument posits that what IHS "would have otherwise provided" for a program is the amount it allocated in its budget for a particular program, rather than what it would have actually spent. Neither the Act nor IHS's apparent practice supports the Secretary's interpretation. The clearest meaning of term "would have otherwise provided" in the context of the Act is what the IHS would have otherwise *spent* on the program. Because IHS may spend more than a tribe's budgeted tribal share if the agency itself runs a particular program—as it did here—it cannot limit funding of an ISDEAA proposal to a tribal share amount. IHS acknowledges as much, stating that it generally determines the applicable funding level for an ISDEAA contract "based on the amount the Agency previously spent to operate the program[.]" Wiggins Decl. ¶ 10. Accordingly, even if IHS had advanced this argument in its declination letter, it would not have justified the denial of the Tribe's proposal.

> iv. Base Hospital Agreement

The Secretary also advances another new ground for declination in her motion for summary judgment. She argues that the Tribe has not demonstrated that it will be able to obtain a base

13

hospital agreement, which she claims is required in order to operate an EMS program on Nevada state roads. Def.'s Mot. at 39 n.18. Again, because IHS did not advance this argument in the declination letter, it cannot form the basis of the decision to decline the Tribe's proposal.

        D. <u>Injunctive and Mandamus Relief</u>

In its Complaint, the Tribe requests, among other relief, that the Court issue an injunction requiring the Secretary to enter into a self-determination contract with the Tribe in the full amount of its contract proposal. The Secretary responds that the Tribe has not satisfied the equitable requirements for injunctive or mandamus relief. Def.'s Mot. at 41-42. Because the IDEAA specifically provides for both injunctive and mandamus relief to remedy violations of the Act, 25 U.S.C. § 450m-1(a), however, the Tribe need not demonstrate the traditional equitable grounds for obtaining the relief it seeks. See <u>Susanville Indian Rancheria v. Leavitt</u>, No. 07-259, 2008 WL 58951, at *10–11 (E.D. Cal. Jan. 3, 2008) (holding that a plaintiff seeking injunctive relief under the ISDEAA need not satisfy the traditional equitable requirements); <u>Red Lake Band of Chippewa Indians v. Department of the Interior</u>, 624 F. Supp. 2d 1, 25 (D.D.C. 2009) (granting specific performance on an ISDEAA contract without considering the ordinary grounds for such relief because injunctive relief is provided for in the statute).

The Secretary also argues that the Tribe's proposal is simply too expensive for IHS to fund without affecting the amounts that the Fort McDermitt and other regional tribes will receive from IHS appropriated funds. For the reasons explained previously, the expense of operating a program cannot be a basis for denying a tribe's ISDEAA proposal. That being said, the Court concludes that the amount the Secretary "would have otherwise provided" should not *necessarily* be set at the prior year's actual expenditure on the program—in this case $502,611.30. That is especially so if the Secretary can establish that the prior year's expenditure was somehow aberrant and would not continue over the term of the contract. Nothing in the Act requires the Secretary to provide a

14

windfall to a tribe based on a temporary cost spike. The Court, moreover, has broad discretion to fashion an appropriate remedy in equity. See, e.g., Peyron v. DiMario, 287 F.3d 1121, 1126 (D.C. Cir. 2002) ("A 'district court has wide discretion to award equitable relief.'" (quoting Barbour v. Merrill, 48 F.3d 1270, 1278 (D.C. Cir. 1995))). Accordingly, while the Court will issue an order declaring that the Secretary violated the ISDEAA by denying the Tribe's proposal outright, it will not direct her to enter into the Tribe's contract at the 2012 amount. Rather, it will direct the Secretary to negotiate with the Tribe over what the Secretary "would have otherwise provided" for the EMS program had IHS continued to operate it, plus the administrative and start-up cost authorized under the Act.

**IV.  Conclusion**

For the reasons set forth above, the Court will grant in part and temporarily deny in part the Tribe's motion for summary judgment and deny the Secretary's motion to dismiss or, in the alternative, for summary judgment. The Court will issue an order consistent with this opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  October 7, 2014

15